# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ELLEN GAYLE MOORE, FANNIE McCONNELL, SPENCER WILLIAMS and ANITA BOWERS, on Behalf of Themselves and all Others Similarly Situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) ) | CIVIL ACTION NO.: CV-99-BU-3262-S |
| vs. | ) ) | CLASS ACTION |
| LIBERTY NATIONAL INSURANCE COMPANY, | ) ) ) | Plaintiffs Demand a Trial by Jury |
| Defendant. | | |

## FIRST AMENDED CLASS ACTION COMPLAINT

S3

Plaintiffs bring this action both individually and on behalf of the class of persons defined below against Liberty National Insurance Company, and pursuant to their investigation, upon knowledge as to themselves and their own acts and otherwise upon information and belief, for their Complaint allege as follows:

## I. JURISDICTIONAL ALLEGATIONS

1.    Plaintiffs Ellen Gayle Moore, Fannie McConnell, Spencer Williams and Anita Bowers are citizens of DeKalb County, State of Alabama.

2.    Defendant Liberty National Insurance Company is an Alabama corporation which conducts substantial business in many states. Liberty National Insurance Company and several life insurance companies owned by Liberty National Insurance Company sold a substantial number of industrial insurance products, including, but not exclusive of, life insurance, burial insurance, and health and accident insurance. Service Insurance Company of Alabama ("Service"), was a wholly owned subsidiary of Liberty National Insurance Company, which has been merged into Liberty National Insurance Company. Liberty National Insurance Company is responsible for and has assumed the liabilities of Service. Prior to the merger referred to above, Service was operated by and controlled by Liberty National Insurance Company for the purpose of issuing insurance products to African-Americans. At all times Liberty National Insurance Company has controlled Service in all respects including, but not limited to, the establishment of premium rates and Policy administration and issuance policies and procedures. Liberty National Insurance Company and Service are hereinafter collectively referred to as "Liberty National" in this Complaint.

3.    A substantial number of the events, omissions and conduct which gave rise to the Plaintiffs' claims took place in DeKalb County, Alabama.

4.    Because Liberty National resides and conducts business in this district and because a substantial part of the events, omissions and conduct giving rise to the claim occurred in this district, venue is proper in this district and this division.

Federal jurisdiction exists pursuant to 28 U.S.C. §1331 as to Plaintiffs' claim of race discrimination in violation of 42 U.S.C. §1981. The Court has supplemental jurisdiction of all remaining claims pursuant to §1367.

## II.  NATURE OF THE CASE

5.     This is a class action seeking redress for a nationwide scheme and common course of conduct involving racial discrimination, fraudulent concealment, unconscionable conduct and breach of contract by Liberty National relating to the marketing, sale and administration of so-called "industrial life" insurance policies. As used in this Complaint, the terms "Policies," "Industrial Policies," "Industrial Insurance" and "Industrial Life Insurance" refer to industrial life insurance products, including, but not limited to, life insurance, burial insurance and health and accident insurance marketed, sold or administered by Liberty National. In addition, as set forth in this complaint, the terms "Policies," "Industrial Policies," "Industrial Insurance" and "Industrial Life Insurance" also refer to monthly debit ordinary policies and all other life insurance policies where race-based pricing was used.

6.     This action is brought by Plaintiffs as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination) an ownership interest in one or more Industrial Policies issued by Liberty National, and whose Policies were issued and administered based upon the nationwide unconscionable scheme and common course of conduct described herein and who were thereby harmed (the "Class" or "Class Members").

7.     Plaintiffs seek injunctive and equitable relief, compensatory damages, punitive damages and other remedies for Liberty National's unlawful, unconscionable and racially discriminatory conduct described herein in connection with the training of its agents and the sale and administration of Industrial Life Insurance Policies to Plaintiffs and Class Members.

8.     For more than fifty years, Liberty National has maintained a discriminatory and unconscionable scheme in order to increase its own revenues and

profitability to the detriment of Class Members, by implementing uniformly misleading, deceptive, unconscionable, and racially discriminatory sales and Policy administration practices. Liberty National instituted these practices, *inter alia*, in order to compete with other insurance companies offering similar types of Policies.

9.    Industrial Life Insurance is a life insurance product with relatively low face value which is typically, although not always, less than $2000, and premium payments which are intentionally designed to appear to the policyholder to be modest premium payments. These premium payments have been historically collected on a weekly or monthly basis by Liberty National sales agents.

10.    As part of its nationwide scheme, Liberty National targeted low income, impoverished, unsophisticated and minority segments of the population and marketed the Industrial Life Insurance product for sale to these consumers. In addition, on information and belief, for many years, Liberty National routinely, knowingly and intentionally caused Service to charge African-American individuals more for these Policies than Liberty National charged similarly situated Caucasian individuals. On information and belief, to the extent this discriminatory practice changed, African-Americans who purchased Industrial Policies before this discriminatory practice changed, continued to pay the same premiums which had been established under Liberty National's discriminatory pricing system. Liberty National also, as part of its routine practice and procedures, prohibited its agents from selling ordinary life insurance policies to African-Americans. Liberty National was motivated by discriminatory intent and continues to discriminate against African-Americans in the manner set forth below.

11.    Liberty National constructed the Industrial Policies with small face value and charged weekly or monthly premiums often under $1.00. Liberty National has intentionally marketed these Policies through agents who are given exclusive territories, known as "debit routes." To effectuate the sale and administration of the Industrial Policies on a "debit" basis, Liberty National agents have been trained to

- 3 -

personally visit the homes of Class Members residing on their routes to collect the premiums and develop a personal relationship with the Class Members that would facilitate the sale of additional Policies. Liberty National has trained its agents to market and sell certain of these Policies as "burial" protection to manipulate the emotions of prospective policyholders by instilling in, or playing to, a sense of shame in leaving their loved ones without funds to pay for a funeral at the time of their death.

12.    In designing, developing, marketing and selling these Policies, at all times Liberty National has known that it targeted a disadvantaged segment of the population which was unsophisticated with respect to insurance and related financial dealings or affairs and ill-equipped to understand the unfamiliar and technical language of the Policies, or the complex and sophisticated methods of determining premium payments. Liberty National has also known that the premiums appear small and affordable to Class Members, and that at the time of purchase the benefits totaled more than these disadvantaged individuals could conceive of saving in their lifetime. Liberty National has known, but has intentionally concealed from Class Members, what these targeted, unsophisticated Class Members did *not* know; that with respect to certain Policies, the small premiums would far exceed the face value of the Policies during the insureds' lifetime.

13.    Liberty National designed the Industrial Policies to create the illusion that they would provide valuable yet affordable benefits. In reality, the Policies are unconscionable products which were calculated to generate tremendous profits for Liberty National with little attendant risk to Liberty National and little or no economic benefit for the unsuspecting and vulnerable Plaintiffs and Class Members. At the same time, although the premiums appeared small and affordable, the premiums are exorbitant in relation to the minimal benefits actually provided to Class Members. Further, Liberty National has known that, in the event of lapse for nonpayment of premium, Liberty National's practice is to conceal any cash value

from its policyholders and to use any cash value to pay premiums until any and all value of the Policy is completely depleted.

14.    Given the design features of the Industrial Policies, Liberty National has known that virtually no transfer of risk to Liberty National has taken place. Liberty National also has known that to the extent that any risk was transferred, it was *de minimis* and would quickly dissipate over the life of the Policies. As Liberty National expected, the Company's profits have continued to expand and the *de minimis* risk, if any, has been quickly eliminated.

15.    Liberty National has trained, allowed or encouraged its agents to routinely sell Industrial Life Insurance products to Plaintiffs and Class Members when the Class Members' best interest would have been served, assuming a life insurance need existed, by traditional ordinary life insurance of similar face amounts.

16.    Liberty National has trained, directed and knowingly allowed its agents to sell multiple Policies where policyholders had no need for the insurance and where multiple Industrial Policies were used to reach a cumulative total of face amount which, in the best interest of the Plaintiffs and Class Members, could have been achieved through the use of ordinary policies of comparable value. Liberty National has had knowledge when multiple sales occurred through its established home office issuance procedures. Nevertheless, Liberty National has maintained this practice because of the excessive profitability of the Industrial Life Insurance products.

17.    Consistent with its effort to increase profits, Liberty National has knowingly and intentionally set out to cut the administration costs associated with Industrial Policies even when doing so worked to the detriment of its African-American policyholders. Liberty National issued Industrial Policies which had, for many years, been serviced by agents on weekly debit routes. In furtherance of its plan to increase its profits and decrease its costs at the expense of African-American policyholders, Liberty National has terminated or modified the practice of weekly premium collection by debit agents throughout the country on in-force Industrial Life

Policies. Liberty National has not reduced premium payments even though the costs associated with the weekly debit system were expense loaded into the premium at the time of Policy issuance and therefore has been unjustly enriched by this practice. This practice of weekly premium collection by agents was part of the course of dealing between the African-American policyholders and Liberty National.

18.     Liberty National Insurance Company has also systematically failed to pay death benefits that were due to African-American policyholders under the Industrial Policies. Liberty National has improperly reaped millions of dollars in premiums and unpaid death benefits by virtue of its fraudulent concealment and overreaching policy administration practices.

19.     Liberty National Insurance Company's plan, scheme and nationwide common course of conduct was designed to and did induce thousands of existing and prospective African-American policy owners to purchase Industrial Life Insurance Policies from Liberty National. Plaintiffs and Class Members have lost and/or face losing millions of dollars in premiums paid which exceed the face value of the Policies or which exceed a reasonable or appropriate total of premiums which should have been paid for their Policies.

20.     The sales practices described herein have been successful for Liberty National. Liberty National has received millions of dollars of premium income on the Policies including millions of dollars of premiums which cumulatively exceed the reasonable or appropriate total of premiums which should have been paid for the Industrial Policies.

21.     Insurance premiums constitute the consideration paid to an insurer for the issuance and delivery of a policy of insurance. Insurance premiums are determined by multiplication of the rate (or unit charge) to the measure of exposure or amount of insurance provided in an insurance policy.

22.     Rate-making is the process of establishing rates used in insurance to estimate the future costs associated with the transfer of risk. Insurance rates are

established by actuaries employed by insurance companies, including Liberty National. Actuaries hold themselves out, and are held out by their employers, to be professionals charged with the duty to act in the public interest. The American Academy of Actuaries has adopted Actuarial Standards of Practice as well as a Code of Professional Conduct. The Preface to the Actuarial Standards of Practice provides that Actuaries are expected to provide counsel which is not only in the clients' interest but also in the interest of the public. Actuaries are to act in the public interest with "competence, integrity and objectivity of a high order."

23.    The premiums established and charged to the Plaintiffs and the Class by Liberty National for Industrial Insurance Policies are and were known by Liberty National to be racially discriminatory, excessive, unfair, unconscionable, unlawful and unreasonable. Liberty National's Industrial Insurance Policies were designed to and have yielded a rate of return on these insurance products for Liberty National which is unreasonable.

### III.    FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

24.    Plaintiffs' claims did not accrue and the statute of limitations did not begin to run until the Plaintiffs knew or reasonably should have known that they were suffering injuries based upon unlawful discrimination. Plaintiffs and Class Members did not know and did not have reason to know that they were injured or that they were being discriminated against until less than two years prior to the filing of the original complaint in this action. In addition, Plaintiffs' claims have accrued within the limitations period because Liberty National's violations are continuing.

25.    Furthermore, the statute of limitations has not run as to Plaintiffs' claims because the statute of limitations would be suspended due to Liberty National's fraudulent concealment of its discriminatory practices. The statute of limitations would also be tolled under the doctrine of equitable tolling.

26.    When Plaintiffs purchased their policies, they were told that purchasing a given policy would cost a specified amount. Plaintiffs were not shown rate books. Plaintiffs were not shown anything that would indicate the premiums paid by Caucasian policyholders. Plaintiffs were not told Caucasian policyholders paid lower premiums. Liberty National did not tell Plaintiffs that different rates existed for Caucasian policyholders. Plaintiffs were not shown any documents which would reveal that Caucasian policyholders paid lesser premiums for the same coverage. The logical inference from everything Liberty National told Plaintiffs was that all policyholders paid the same premiums for the same types of policies.

27.    Plaintiffs and Class Members were given no information that would have alerted them to Liberty National's discriminatory conduct with respect to premiums, cash values and death benefits, either at the point of sale or in later years. Plaintiffs and Class Members received no documents reflecting Liberty National's discriminatory premiums or other discriminatory practices. The Policies themselves do not reflect that African-Americans were charged higher premiums or that they would receive lower death benefits and cash values than similarly situated Caucasians, nor did they receive annual statements or any other documents which reflected Liberty National's ongoing and knowing discrimination. In fact, although Liberty National's sales agents used rate books reflecting Liberty National's discriminatory practices, the agents were trained to withhold this information from prospective African-American policyholders. Thus, the Liberty National rate books were neither disseminated nor available to Plaintiffs and Class Members.

28.    The decisions to sell to African-Americans, to discriminate on the basis of race and to conceal Liberty National's discriminatory practices were made in the early 1940's. Liberty National continues to act in accordance with and in furtherance of its discriminatory practices as set forth more fully herein. Liberty National also continues its practice of fraudulently concealing its discriminatory practices. Throughout this time period, Liberty National has refused to release or provide

information about its knowing discrimination against Plaintiffs and Class Members in any way that the Plaintiffs and/or Class Members could have discovered the discrimination.    In fact, Liberty National has taken a number of actions to fraudulently conceal its discriminatory practices to insure that these practices were not discovered.  This fraudulent concealment permits the Plaintiffs to bring federal claims on behalf of persons who were harmed by defendant more than two years prior to the filing of this lawsuit.  Although the initial decisions to discriminate and to conceal were made in the early 1940's, Liberty National has repeatedly made the decision throughout the time period to continue the concealment of its discriminatory practices and has acted in accordance with this decision.

29.    Liberty National insured that Plaintiffs could not and would not, through the exercise of due diligence, discover Liberty National's unlawful discriminatory conduct due to the undisclosed and indecipherable manner in which the Policies were designed and priced by Liberty National.

30.    Beginning in or about 1941, the insurance industry constructed mortality tables which used race as a factor to discriminate against African-Americans, who had been disadvantaged by discriminatory socio-economic conditions.

31.    The insurance industry employed these mortality tables as a pretext to charge higher premiums and to pay comparatively lower cash values and death benefits to African-Americans, as compared to Caucasian policyholders.

32.    These mortality tables were not disseminated or otherwise made available to African-Americans who were disadvantaged by the tables.

33.    The discriminatory mortality assumptions, in turn, were deliberately embedded in the pricing and policy design assumptions by Liberty National and other insurance companies.  Nowhere on the face of policy documents provided to African-American policyholders does *any* information appear which would reveal that the premium charged was based upon racially discriminatory rates.

- 9 -

34.    The unknown and inherently unknowable nature of Liberty National's discriminatory pricing and policy benefit determinations was exacerbated by the premium rate structure adopted by Liberty National.  The premium rate quoted and charged to any particular policyholder was dependant on a number of undisclosed rating factors, including, for example, attained age, policy type and the face amount of coverage.

35.    Thus, as a practical reality, it was impossible for African-Americans who purchased a Policy from Liberty National to compare their effective premium rate with the premiums charged to similarly situated Caucasian policyholders. Consequently, even if Plaintiffs or other Class Members had reason to inquire or investigate, they would not and could not have discovered that they were sustaining injuries from unlawful, discriminatory conduct by Liberty National.  Moreover, as Liberty National is aware African-American policyholders would not, and did not, learn the rates being charged to Caucasian policyholders were lower for the same amount of insurance.

36.    The same is true with respect to cash values.   The inherently undiscoverable nature of Liberty National's discriminatory conduct was further hidden from Plaintiffs and the Class by Liberty National's affirmative efforts to conceal its unlawful conduct through pretextual and misleading premium rates and its other acts of fraudulent concealment, as alleged below.

37.    Liberty National, its affiliates and the companies for which Liberty National is now responsible engaged in a concerted and continuous course of conduct that was intended to fraudulently conceal their unlawful discriminatory practices from Plaintiffs and the Class.

38.    Internally, Liberty National acknowledged its discriminatory policies, classifying African-American policyholders charged higher premiums as "Negro" risks as opposed to Caucasian policyholders, who were termed "white" risks.  In its dealings with African-Americans, however, Liberty National concocted an elaborate

and pretextual premium rating structure to disguise and conceal from Plaintiffs and the Class the fact that they were being charged racially discriminatory premiums.

39.    In the rate books disseminated by Liberty National to its field sales force, the rates for African-Americans were pretextually referred to as "standard" rates, while the rates for Caucasians were referred to as "preferred" rates.

40.    Liberty National trained its agents to sell policies to African-Americans using the more expensive, discriminatory premiums and trained its agents not to disclose to African-American policyholders that the premiums were discriminatory. Liberty National's sales force was trained to tell potential African-American customers, and in fact did tell them on a systematic basis, that they were receiving the "standard" rates. The logical inference was that the African-Americans were not being discriminated against. In fact, African-Americans were actually being charged a higher, discriminatory rate.

41.    By design, African-Americans were misled so as to believe that they were paying the same "standard" non-discriminatory rates as Caucasian policyholders. The sales force did not tell African-American customers that the "preferred" rate was for white customers only.

42.    This practice began in the early 1940's and continued at least until the mid-1970's. Liberty National either knew or reasonably should have known that the Plaintiffs and Class Members would not learn about the discrimination. The nature of society was and is such that African-Americans generally would not learn the more favorable rates that were being charged to Caucasians. Liberty National refused to release or provide information about its discrimination against Plaintiffs and the Class in any way that the Plaintiffs and/or Class Members could have discovered the discrimination.

43.    To maximize its discriminatory sales to African-Americans, Liberty National adopted a distribution system which created economic incentives for its sales agents to prey on the African-American community.

- 11 -

44.   Liberty National sales agents were assigned "debit" routes confined to predominantly African-American communities and neighborhoods.

45.   Likewise, Liberty National agents were authorized or encouraged to sell higher priced, poorly performing Industrial Policies to African-Americans and were prevented or discouraged from selling to African-Americans other available products that would provide better benefits for lower premiums.

46.   Liberty National adopted a compensation system which rewarded sales agents economically for discriminatory sales to African-Americans. Liberty National agents were paid commissions based on the premium amount of insurance that they sold.  Thus, Liberty National agents profited to the extent they sold higher-priced inferior policies to African-Americans.  In the compensation plan for agents who sold its policies, Liberty National created incentives for the agents to disclose only those facts that would encourage sales of insurance.  Liberty National itself, like its agents, also benefitted from increased sales to African-Americans of higher-priced inferior insurance policies.  Disclosure of the fact that Plaintiffs and the Class had been the victims of discrimination would have reduced sales or required Liberty National to lower premiums or provide increased benefits to African-Americans, thereby reducing Liberty National's profits.

47.   Therefore, as a result of the sales system and incentives that Liberty National created, the unlawful, racially discriminatory practices outlined herein were intentionally concealed from Plaintiffs and the Class.

48.   Beginning at least in the early 1940s and continuing today or until very recently, Liberty National employed underwriting or rating classifications as a clandestine means to discriminate against African-Americans.  Liberty National developed underwriting criteria which appeared to be racially neutral but which were, in reality, employed as a pretext to continue discrimination against African-Americans.  For example, Liberty National specified certain occupations (such as janitors, maids and "bootblacks") that were predominantly held by African-

Americans and used other underwriting criteria (such as undesirable residential neighborhoods, immoral behavior, or undesirable personal traits) to justify Liberty National's continued practice of charging African-Americans higher premiums for inferior policies. These pretextual standards created the appearance of racially neutral underwriting when, in fact, they were used as tools to continue and conceal Liberty National's discriminatory conduct. Similarly, Liberty National replaced its older Industrial Policies with new products, such as so-called "monthly debit ordinary" or "MDO" policies to continue and to conceal Liberty National's ongoing unlawful discrimination.

49.    Plaintiffs and Class Members could not reasonably discover the discriminatory premiums and did not do so until less than two years before the filing of the lawsuit. Statements or actions undertaken by Liberty National to obscure the claims of the Plaintiffs and the Class included training Liberty National's sales agents, directly or indirectly, not to tell Plaintiffs and the Class about Liberty National's discriminatory practices and conduct.

50.    Plaintiffs and the Class were misled into believing that they were being charged standard, nondiscriminatory rates, and none of the Plaintiffs or Class Members learned about the discrimination until less than two years before the filing of this lawsuit. In fact, they did not learn about the discrimination until a very short time before the lawsuit was filed. For the reasons alleged above, the vast majority of Class Members still do not know that they have been and continue to be injured by Liberty National's discriminatory conduct. Therefore, the limitations period has not possibly run on the Plaintiffs and Class Members. Much of the information about all of the matters pleaded in this section is in the sole possession of Liberty National. Based upon information and belief, the Plaintiffs allege that discovery will lead to more detailed and particular information relating to the matters alleged herein and to Liberty National's practices of fraudulent concealment.

- 13 -

51.    As a practical matter, no Plaintiff or Class Member could have discovered Liberty National's discriminatory conduct. Since Liberty National began selling to African-Americans, the Company instructed its agents not to inform African-American policyholders of the discriminatory rates. Liberty National and its agents knew that disclosing such information would result in the sale of fewer policies to African-Americans. Since Liberty National initially began selling to African-Americans and continuing until the mid-1970's, Liberty National instructed its agents that they were not allowed to sell better policies to African-American customers. One of the ways that Liberty National concealed the discrimination from Plaintiffs and the Class was that Liberty National effectively trained its agents not to share or show full rate books to customers. At most, the agents would show only the rate that was being charged to the person buying the policy, and the rate book said that it was a standard rate, leading Plaintiffs and Class Members to believe that they were not being discriminated against. The Plaintiffs allege that this practice continues today. Liberty National further concealed its discriminatory practices by changing the name of its product from Industrial Life to monthly debit ordinary life insurance. In reality, no consumer could or can discover Liberty National's racial discrimination, given the way premiums are set. Absent disclosure by Liberty National or its agents, Plaintiffs and Class Members could not discover that they were being discriminated against. Liberty National did not make such disclosures. Instead, Liberty National actively concealed its discriminatory conduct.

52.    In addition, the limitations period has not run because Liberty National's discriminatory conduct is continuing in nature. Liberty National continues to charge and accept discriminatory premiums from various Plaintiffs and Class Members. For example, Plaintiff McConnell is still paying premiums on Policy #15153077, attached as Exhibit D. She is paying twelve cents per week because she is African-American, and if she were Caucasian, she would be paying ten cents per week for this $2000 policy. Plaintiff Williams is still paying premiums of 35 cents per week because he

is African-American, and if he were Caucasian, he would be paying 30 cents per week. Plaintiff Bowers is still paying premiums at a higher rate because she is African American.

53.    Even with respect to "paid up" policies, there are "cash values" which Liberty National adjusts each year. Liberty National continues to discriminate against each Plaintiff and Class Member when it adjusts the cash values of the Policies, including within two years of the filing of the complaint. In fact, the difference in cash values for Policies sold to African- Americans as compared to Policies sold to Caucasian Americans continues to increase each year.

54.    There is a substantial nexus between the acts of discrimination within the two years of filing suit and the acts of discrimination prior to that time. The acts involve the same type of discrimination. The acts are recurring and not isolated.

55.    However, the acts of discrimination did not trigger the awareness of the Plaintiffs or the Class Members to assert their rights, because, among other things, there was no reasonable way for the Plaintiffs or the Class Members to learn that they were being discriminated against, and they did not learn of the discrimination.

56.    Finally, Liberty National is equitably estopped from raising the statute of limitations. The equitable tolling is justified based upon the matters alleged throughout this complaint including the matters set forth above in this section.

57.    Plaintiffs and Class Members have acted with reasonably prudent regard with respect to their rights. The facts which support the Plaintiffs' causes of action were not apparent to the Plaintiffs or the Class Members. The practicalities of the situation justify any delay in the filing of the claims in this action.

## IV. FACTUAL ALLEGATIONS

58.    Plaintiffs are residents of Collinsville, DeKalb County, Alabama. Ms. Moore is a 49 year old African-American who was charged a discriminatory premium on her life insurance Policy. Ms. McConnell is a 72 year old African-American who was charged a discriminatory premium on her insurance Policies.

- 15 -

Mr. Williams is a 51 year old African-American who was charged a discriminatory premium on his insurance Policies. Ms. Bowers is a 43 year old African-American who was charged a discriminatory premium on her insurance Policies.

### Ellen Gayle Moore

59.    Ms. Moore is a member of the Class defined above.

60.    Ellen Gayle Moore is a resident of Collinsville, DeKalb County, Alabama. Ms. Moore is a 49 year old African-American who was charged a premium that Liberty National knew to be racially discriminatory on her life insurance Policy, and was also discriminated against as a result of Liberty National's practices alleged above.

61.    On November 15, 1954, Ms. Moore became the insured on an Industrial Life Insurance Policy #929921 which was issued by Service and is attached as Exhibit "A."

62.    Ms. Moore paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her Policy than similarly situated Caucasian individuals would pay.

### Fannie McConnell

63.    Ms. McConnell is a member of the Class defined above.

64.    On April 5, 1965, Ms. McConnell became the insured on an Industrial Insurance Policy #2341927 issued by Service which is attached as Exhibit "B." On November 24, 1969, Ms. McConnell became the insured on an Industrial Insurance Policy #14758551, which was issued by Service and is attached as Exhibit "C." On June 25, 1970, Ms McConnell became the insured on an Industrial Insurance Policy #15153077, which was issued by Liberty National and is attached as Exhibit "D." On May 13, 1974, Ms. McConnell became the insured on an Industrial Insurance Policy #21460692, which was issued by Liberty National Insurance Company and attached as Exhibit "E."

65.    Ms. McConnell paid and is paying her premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for her Policy than similarly situated Caucasian individuals would pay. Ms. McConnell was also discriminated against as a result of Liberty National's discriminatory practices outlined above.

66.    The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

**Spencer Williams**

67.    Mr. Williams is a member of the Class defined above.

68.    On April 5, 1965, Mr. Williams became the insured on an Industrial Insurance Policy #2341929, which was issued by Service and is attached as Exhibit "F." On November 24, 1969, Mr. Williams became the insured on an Industrial Insurance Policy #14758553, which was issued by Service and is attached as Exhibit "G." On August 18, 1975, Mr. Williams became the insured on an Industrial Insurance Policy #22289217, which was issued by Liberty National Insurance Company and is attached as Exhibit "H."

69.    Mr. Williams paid his premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for his Policy than similarly situated Caucasian individuals would pay. He continues to pay such discriminatory premiums. In addition, Mr. Williams was discriminated against as a result of Liberty National's discriminatory practices alleged above.

**Anita Bowers**

70.    Ms. Bowers is a member of the Class defined above.

71.    On April 5, 1965, Ms. Bowers became the insured on an Industrial Insurance Policy #2341930, which was issued by Service Insurance Company of

Alabama and is attached as Exhibit "I." On November 24, 1969, Ms. Bowers became the insured on an Industrial Insurance Policy #14758555, which was issued by Service and is attached as Exhibit "J." On August 11, 1975, Ms. Bowers became the insured on an Industrial Insurance Policy #22275736, which was issued by Liberty National and is attached as Exhibit "K."

72.    The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

73.    Ms. Bowers paid and continues to pay her premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for her Policy than similarly situated Caucasian individuals would pay. In addition, Ms. Bowers was discriminated against as a result of Liberty National's discriminatory practices alleged above.

74.    The premiums on the Policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

## V.    CLASS ACTION ALLEGATIONS

75.    This case is brought as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of this action as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination), an ownership interest in one or more Industrial Life Insurance Policies issued, serviced, administered or purchased from Liberty National, and who were harmed by the conduct alleged herein (the "Class"). This case is

properly brought as a class action under Rule 23, for the reasons set forth in the following paragraphs.

76.    This action is appropriate as a class action pursuant to Rule 23. Since Plaintiffs seek injunctive relief and corresponding declaratory relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Liberty National. Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

77.    Membership in the Class is so numerous that separate joinder of each member is impracticable. The number of Class Members is unknown but can be easily determined from the records of Liberty National. Plaintiffs believe that there are thousands of persons in the Class. Although Plaintiffs do not presently know the names of all Class Members, their identities and addresses can be readily ascertained from Liberty National's records.

78.    The named Plaintiffs are members of the Class of victims described herein. They were subject to a common course of conduct by Liberty National and purchased Industrial Life Insurance from Liberty National based upon the discriminatory sales and policy administration practices described herein.

79.    There are numerous and substantial questions of law and fact common to all Class Members which control this litigation and which predominate over any individual issues. Included within the common questions are:

(a)    Whether Liberty National discriminated against Class Members by charging them more in premiums for Industrial Life Insurance than similarly situated Caucasian people;

(b)     Whether Liberty National discriminated against Class Members by offering only substandard products to African-Americans;

(c)     Whether Liberty National discriminated against Class Members by altering the debit system of collection unilaterally;

(d)     Whether Liberty National acted with scienter when discriminating against Class Members;

(e)     Whether Liberty National breached its contracts with Plaintiffs and the Class by changing its administration of its Industrial Policies;

(f)     Whether Liberty National routinely failed to disclose to Plaintiffs and Class Members material information about their contracts such as the actual basis on which premiums would be calculated and the likelihood that, during the policyholder's normal life expectancy premium payments would exceed the face value of the Policies or a reasonable amount of total premiums;

(g)     Whether Liberty National developed, encouraged and engaged in a scheme designed to sell and administer Industrial Policies through fraudulent concealment of material facts;

(h)     Whether Liberty National failed to supervise and train its agents who engaged in the schemes described herein and failed to prevent its agents from violating uniformly applicable state insurance laws and regulations;

(i)     Whether Liberty National breached its contracts with the Plaintiffs and the Class by refusing or deliberately failing to provide the true amount of life insurance that their premiums would buy under "white" policies;

(j)     Whether Liberty National failed to adequately supervise, educate and train its agents regarding the terms of its Policies, appropriate methods of sales presentations, creation of sales materials and information, and compliance with state and federal laws (including state insurance laws and regulations), and whether Liberty National's failure to do so constituted a means by which Liberty National engaged in the schemes described herein;

- 20 -

(k)    Whether Liberty National engaged in a nationwide discriminatory course of conduct in targeting the sale of Industrial Life Insurance to an economically disadvantaged and unsophisticated segment of the population and marketed and sold such Policies in a manner to induce the purchase of the Industrial Policies by Plaintiffs and Class Members, and whether Liberty National discriminated against Class Members in establishing premiums for Industrial Policies;

(l)    Whether Plaintiffs and Class Members are entitled to specific performance, injunctive relief, declaratory relief or other equitable relief against Liberty National;

(m)    Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Liberty National;

(n)    Whether Plaintiffs and Class Members have sustained damages and the proper measure of damages; and

(o)    Whether Liberty National terminated or altered the debit system and failed to provide a premium rebate or reduction, even though the Policies were expense loaded for weekly collection.

80.    The claims of the Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interest adverse to the interests of other Class.

81.    Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel experienced and competent in prosecution of insurance class actions and complex litigation.

82.    Liberty National is unwilling to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Class Members will continue to suffer damage and Liberty National's violations of law will proceed

without remedy while Liberty National continues to retain the proceeds of its ill-gotten gains.

84.    Most individual Class Members have little ability to prosecute an individual action, due to the complexity of the issues involved in this litigation, the size and scope of Liberty National's uniform sales scheme, the significant costs attendant to litigation on this scale, and the comparatively small, although significant, damages suffered by individual Class Members.

85.    This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be insured.

86.    This action presents no difficulty that would impede its management by the Court as a class action and a class action is superior to other available methods for the fair and efficient adjudication of their claims.

87.    Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to require Liberty National to specifically perform the Policies as represented and to disgorge any premium overcharges.

## COUNT I
### (Race Discrimination 42 U.S.C. §1981)

88.    Plaintiffs repeat, reallege, and incorporate herein by reference the paragraphs above as if fully set forth herein.

89.    Defendant intentionally and purposefully discriminated against Plaintiffs and Class Members by charging them higher premiums than those charged to similarly situated Caucasian policyholders and by prohibiting or specifically instructing their agents to not offer or sell participatory whole life or other reasonably priced policies or products to African-Americans.

90.    By charging higher premiums to African-Americans and refusing to offer participatory whole life or other reasonably priced policies or products to

African-Americans, Liberty National violated the rights of Plaintiffs and Class Members to make and enforce contracts on the same terms as Caucasian policyholders.

91.     Defendant's actions violate 42 U.S.C. §1981, as well as the rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth Amendments of the Constitution of the United States.

92.     Defendant has damaged Plaintiffs and Class Members because Plaintiffs and the Class have suffered economic loss and mental anguish as a result Liberty National's illegal racial discrimination.

## COUNT II
### (Race Discrimination 42 U.S.C. §1982)

93.     The plaintiffs repeat, reallege, and incorporate by reference the paragraphs above as if fully set forth herein.

94.     Life insurance is personal property within the meaning of 42 U.S.C. §1982.

95.     Liberty National has discriminated against Plaintiffs and the Class with respect to the life insurance policies they have inherited, purchased, and held. Plaintiffs and Class Members have not had the same right to inherit, purchase, and hold the insurance sold by defendant. Liberty National has violated 42 U.S.C. §1982.

96.     Liberty National's violation of 42 U.S.C. §1982 was intentional and malicious.

97.     Plaintiffs and the Class have continued to hold Polices within the time period or periods allowed under the Plaintiffs' claims.

98.     As a proximate result of Liberty National's violation of 42 U.S.C. §1982, Plaintiffs and the Class have been damaged.

## COUNT III
### (Breach of Contract)

99.     Plaintiffs repeat, reallege and incorporate herein by reference the paragraphs above.

- 23 -

100.   As a material part of the insurance agreement between Liberty National and Plaintiffs and the Class (either through the express terms of the Policies, applicable statutory provisions or the course of dealing of the parties) from inception of certain policies, premium payments were collected by debit agents for Liberty National on a weekly basis.

101.   Beginning in or about 1995 or 1996, Liberty National Insurance Company began and continues to unilaterally dismantle and/or alter the established weekly debit collection system which had been the established method of premium collection since inception of certain policies, and thereafter required premium payments to be made directly to Liberty National by Plaintiffs and the Class or collected them on a less frequent basis. At the same time, Liberty National continued to demand and collect the same premium paid under the original debit system even though it was no longer providing the same debit collection to the policyholder. In this respect Liberty National collected premiums for coverage which was not provided, or in other words, collected unearned premiums.

102.   By dismantling or altering the established debit premium collection system and thereby unilaterally altering the method of premium collection, Liberty National breached a material contractual term of its agreement with Plaintiffs. As a result of the breach, Plaintiffs and the Class have suffered economic damage and are entitled to specific performance. By paying premiums directly rather than through the debit procedure contemplated at the time of contracting, Class Members have lost a bargained-for service with no corresponding decrease in premiums. Plaintiffs have also been forced to incur additional burdens and expenses in making such payments. In addition, Liberty National's discontinuance of the debit premium collection system resulted in the lapse of numerous policies.

103.   Alternatively, Liberty National has been unjustly enriched by continuing to collect expense loads attributable to the weekly debit collection system, even though that system was dismantled. These premium expense loads exceed the

expense of the new, less-costly, premium collection systems. Plaintiffs and the Class have suffered an equitable detriment from this wrongful conduct by Liberty National. Therefore, the law implies a debt founded in equity, as it were upon a contract to recover back money, which ought not to be kept by Liberty National as an ill-gotten gain.

## OTHER COUNTS

104.    Solely for the purpose of preserving Plaintiffs' right to appeal the Court's July 3, 2000 Memorandum Opinion and Order on Plaintiffs' motion to alter or amend the judgment of the Court and for leave to file an amended complaint, Plaintiffs reallege and incorporate by reference the following counts and related allegations of plaintiffs' Class Action Complaint, filed December 8, 1999: Count II (Breach of Fiduciary Duty), Count III (Assumpsit on Money Had and Received), Count IV (Declaratory and Injunctive Relief), Count V (Unjust Enrichment and Imposition of a Constructive Trust), Count VI (Improper Hiring, Supervision, Retention, and Failure to Monitor Actions of Officers and Agents and/or Employees), Count VIII (Fraudulent Inducement), and Count IX (Negligent Misrepresentation).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Liberty National for themselves and Class Members as follows:

A.    An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and the Class compensatory and punitive damages in an amount to be proven at trial for the wrongful acts complained of;

C.    Awarding Plaintiffs and the Class their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

D.    Ordering specific performance on the insurance contracts.

E.    Granting extraordinary equitable, declaratory and/or injunctive relief as permitted by law or equity, including attaching, impounding or imposing a constructive trust upon, or otherwise restricting, the proceeds of Liberty National's unjust enrichment and ill-gotten funds to ensure Plaintiffs and Class Members have an effective remedy; and

F.    Granting such other and further relief as the Court deems just and proper including but not limited to recissionary relief and reformation.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues triable at law.

Joe R. Whatley, Jr., Esquire
Charlene P. Ford, Esquire
Whatley Drake, L.L.C.
1100 Financial Center
505 20th Street North
Birmingham, Alabama 35203
Office (205) 328-9576
Fax (205) 328-9669

John J. Stoia, Jr., Esquire
Milberg, Weiss, Bershad, Hynes &
      Lerach, LLP
600 W. Broadway
1800 One America Plaza
San Diego, CA 92101
Office (619) 231-1058
Fax (619) 231-7423

26

Melvyn I. Weiss, Esquire
Milberg, Weiss, Bershad, Hynes
    & Lerach, L.L.P.
One Pennsylvania Plaza
New York, NY 10119-0165
Office:    (212) 594-5300
Fax: (212) 868-1229

W. Christian Hoyer
Christa L. Collins
James, Hoyer, Newcomer
    & Smiljanich, P.A.
One Urban Centre, Suite 147
4830 West Kennedy Blvd.
Tampa, FL  33609
Office (813) 286-4100
Fax (813) 286-4174

Herman Watson, Jr., Esquire
Rebekah Keith, Esquire
Watson Jimmerson, Givhan
    & Martin, P.C.
200 Clinton Avenue West, Suite 800
Post Office Box 46
Huntsville, AL 35804
Office:    (256) 536-7423
Fax: (256) 536-2689

Andrew S. Friedman, Esquire
Bonnett, Fairbourn, Friedman &
    Balint
4041 N. Central Avenue, Suite 1100
Phoenix, AZ 85012
Office: (602) 274-1100
Fax: (602) 274-1199

Ron Parry, Esquire
Arnzen, Parry & Wentz, P.S.C.
128 East Second Street
P.O. Box 472
Covington, KY 41012-0472
Office (606) 431-6100
Fax (606) 431-2211

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all Attorneys of Record in the above styled cause by placing a copy of the same, properly addressed and postage prepaid, in the United States Mail on this the _13th_ day of July 2000.

William J. Baxley, Esq.
William C. Barclift, Esq.
Baxley, Dillard, Dauphin & McKnight
2008 3rd Avenue South
Birmingham, AL  35233

Michael R. Pennington, Esq.
James Warren May, Esq.
Bradley, Arant, Rose & White, LLP
2001 Park Place, Suite 1400
Birmingham, AL  35203-2736

Floyd Gaines, Esq.
Gaines & Davis
513 21st Street North
Birmingham, AL  35203

_Charles P. Ford_
Of Counsel

A

DEC-08 '99 WED 09:02 AM   WATSON,FEES,& JIMMERSON     X NO. i 256 536 2689           P. 03



## SCHEDULE

| NAME OF INSURED | BENEFICIARY | TYPE POLICY |
|---|---|---|
| MOORE  ELLEN G | MOORE  PAULINE | CX          CX |

| POLICY NUMBER | DATE OF ISSUE | AGE* | (CENTS) WEEKLY PREMIUM | AMOUNT OF INSURANCE | DIST. | DEBIT |
|---|---|---|---|---|---|---|
| CX          929921 | MO.  DAY  YR.  11   15   54 | 5 | 55 | $ 50'0 | 4 | 115 |

*INSURED'S AGE NEXT BIRTHDAY

## REGISTER OF CHANGE OF BENEFICIARY

NOTE—NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Burial Service Company of Alabama having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

_____                    _____
WITNESS                                      BENEFICIARY

Dated at_____this_____day of_____, 19____

DEC-09 '99 WED 09:02 AM   WATSON, FEES, & JIMMERSON   FX NO. 1 256 536 2669   P. 04

# Service
## INSURANCE COMPANY
### of Alabama

BIRMINGHAM, ALA.

Will pay to the beneficiary in accordance with the provisions of this Policy the amount of insurance granted hereunder upon receipt of due proof of the death of the Insured whose name appears in the schedule on the fourth page hereof.

CONSIDERATION—The insurance is granted hereunder in consideration of the payment in advance of the weekly premium stated in the schedule on Page 4 hereof on or before each Monday beginning with the date of issue of this Policy and continuing until premiums shall have been paid for 10 years or until prior death of the Insured.

AMOUNT OF INSURANCE—The amount of insurance hereunder is the amount set out in the schedule herein, unless at date of death the Insured is under three years of age, in which event, the amount payable for each $100 set out in the said schedule shall be as follows:

(a)  Under three months of age at death, twelve dollars;

(b)  Three months or over but under one year of age at death, eighteen dollars;

(c)  One year or over but under two years of age at death, twenty-four dollars;

(d)  Two years or over but under three years of age at death, sixty-five dollars;

(e)  Three years of age or over at death, full benefit.

(1)  PAYMENT OF PREMIUM—All premiums are payable at the Home Office of the Company weekly in advance, but may be paid to an authorized representative of the Company, provided that such payment must be entered at the time in the premium receipt book belonging with this Policy. The failure of the collector to call for the premium on the Policy will not be an excuse for non-payment as the Insured will then be required to pay the premium at a Branch Office of the Company or remit the same to the Home Office.

(2)  PREMIUMS PAYABLE OTHER THAN WEEKLY—The premium stated in the schedule of this Policy is a weekly premium.  However, if premiums are paid Annually (52 weeks) in advance at one time, such Annual Premium shall be calculated by multiplying the stated weekly premium by 46.8. If premiums are paid Semi-Annually (26 weeks) in advance at one time, the Semi-Annual Premiums shall be calculated by multiplying the weekly premium stated by 24.7.

(3)  GRACE PERIOD—A grace period of four weeks shall be granted for the payment of every premium after the first, during which time this Policy will remain in force subject to the terms hereof, but after the expiration of the said period of grace the Company's liability under this Policy shall cease except as to the Non-Forfeiture privileges herein contained.

(4)  REINSTATEMENT—In the event this Policy should lapse it may be reinstated at any time within three years after due date of the first premium in such default, upon the furnishing to the Company of evidence of insurability satisfactory to the Company and the payment of all premiums in default unless the Extended Insurance has expired or the Cash Surrender Value has been paid.

(5)  EFFECTIVE DATE—This Policy shall take effect on its date of issue, provided the Insured is then alive and in sound health, but not otherwise.

CONDITIONS AND PROVISIONS—This Policy is issued and accepted subject to all of the terms, conditions, provisions, schedules, registers and endorsements printed or written by the Company on this or the succeeding pages hereof, which are a part of this Policy as fully as if recited over the signatures hereto affixed.

In Witness Whereof, The Company has caused this Policy to be executed by its President and Secretary at its Home Office in Birmingham, Alabama, as of the date of issue appearing herein.



A.C. Brown                          W.B. Sowell

SECRETARY                          PRESIDENT

10 PAYMENT LIFE INSURANCE—PREMIUMS PAYABLE 10 YEARS

DEC-0   '99 WED 09:03 AM   WATSON, FEES, & JIMMERSON   FX NO. 1 256 536 2569   P. 05

## TABLE OF NON-FORFEITURE BENEFITS

FOR A POLICY FOR WHICH THE AMOUNT OF INSURANCE IS $100

| Age at Issue | 2 YRS. Ext. Ins. Mos. A | 3 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | 4 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | 5 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | 6 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | 7 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | 8 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | 9 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | 10 YEARS Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Age at Issue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*To obtain the amount of Paid-Up Insurance or the Cash Surrender Values for a policy of which the ultimate amount of Insurance is greater or less than $100, the value stated should be increased or decreased proportionately; e.g., if the ultimate amount of Insurance is $200 the value should be doubled. The periods of Extended Insurance are the same whatever the amount of Insurance.

†Premiums must have been paid on this Policy for the number of years indicated in the first line of the foregoing table to obtain the benefits indicated.

DEC-08   '99 WED 09:04 AM   WATSON, FEES, & JIMMERSON      X NO. 1 253 536 2689      P. 06

(6)  MISSTATEMENT OF AGE—In the event the age at issue is incorrectly stated herein, the Amount of Insurance hereof shall be such as the premiums paid would have purchased at the correct age, and all other benefits shall be based on such correct age and such amount of insurance.

(7)  INCONTESTABILITY—After this Policy has been continued in force during the lifetime of the Insured for a period of one year from its date of issue it shall thereafter be incontestable except for non-payment of premiums.

(8)  BENEFICIARY—By written notice to the Company the Insured may from time to time name a new beneficiary, subject to evidence of insurable interest satisfactory to the Company, but no such change shall be effective until endorsed on this Policy by the Company.

If the beneficiary dies before the Insured the Estate of the Insured shall then automatically become the beneficiary thereof. If the Insured's estate is the Beneficiary, the Company will make payment to the Insured's executor or administrator, provided, however, that the Company may make payments to any relative by blood or marriage, or to any person appearing to the Company to be equitably entitled to such payment because of having incurred expense for the maintenance, medical attention or burial of the Insured. If the beneficiary is a minor, or is otherwise not legally qualified to give a valid release at the time of payment hereof the Company may make payment to any person who furnishes evidence satisfactory to the Company that such person is responsible for, or is actually contributing to the support of, the beneficiary.

(9)  POLICY CONTROL—If the Insured hereunder is a minor, during the minority of such Insured, the right to change the beneficiary and exercise all the rights of ownership under this Policy shall be vested in the beneficiary named herein from time to time; or if such beneficiary dies before the Insured, then such rights shall be vested in the surviving parent of the Insured, or in the legal guardian of the Insured, or in any adult having the custody and control of said minor. After the Insured becomes of age, the entire ownership and control of this Policy shall be vested in the Insured.

(10)  ASSIGNMENT—Neither this Policy, nor any benefit hereunder can be assigned.

(11)  LOSS OF EYESIGHT OR LIMBS—After the third anniversary of the Insured's birth and during the lifetime of the Insured, if the Company shall receive due proof that during the continuance of this Policy, otherwise than as Extended Insurance or reduced Paid-Up Insurance provided in the Non-Forfeiture Benefits, the Insured has suffered any of the losses set forth below solely as a result of disease contracted or injuries sustained after the date hereof and that thirty days have elapsed since such loss, total and permanent disability shall then be deemed to exist, and upon surrender of this Policy and its premium receipt book, the Company will make immediate payment as set forth below, provided, however, that such loss was not sustained from service in the Military or Naval forces of any country at war.

A sum equal to the amount insured hereunder shall be payable in the event of

( i) loss by severance of both hands at or above the wrists;
( ii) loss by severance of both feet at or above the ankles;
(iii) loss by severance of one hand at or above the wrist and one foot at or above the ankle;
(iv) complete and irrecoverable loss of sight of both eyes prior to the seventieth anniversary of the Insured's birth.

In addition to the payments set out herein for such loss the Company will endorse this Policy with a waiver of all further premiums, paying at death the amount insured hereunder.

(12)  OPTION TO SURRENDER WITHIN TWO WEEKS—If the terms of this Policy are not accepted and agreed to it may be surrendered for cancellation at the District Office of the Company through which it was delivered within two weeks from the date hereof and all premiums paid will be refunded.

(13)  PRIVILEGE OF EXCHANGE—Upon written application and evidence of insurability satisfactory to the Company this Policy may be surrendered to the Company in exchange for another policy on any plan then issued by the Company requiring premium payments less frequent than weekly, provided, the new policy is for at least the minimum amount issued by the Company on the plan applied for. In executing such change the full reserve on this Policy shall be applied to reduce premium payments on the new policy in accordance with the terms and conditions then agreed upon with the Company.

(14)  NON-FORFEITURE BENEFITS—Extended Insurance—In the event this Policy lapses after premiums have been paid for the respective periods shown in the Table of Non-Forfeiture Values herein the Amount of Insurance granted under this Policy shall be automatically continued in force as Extended Insurance for the number of months specified in the column marked "A" in the said Non-Forfeiture Table. The term of Extended Insurance shall commence on the due date of the first premium in default.

(A)  PAID-UP LIFE INSURANCE—After this Policy has been in force with premiums paid for the number of years shown in the table below, the Insured may, by making written application upon blanks furnished by the Company within thirteen weeks of the due date of the first premium in default, have this Policy endorsed for a reduced amount of Paid-Up Life Insurance payable at the death of the Insured. Such amount shall be in accordance with the amount stated in Column "B" in the table of Non-Forfeiture Values, provided, however, that such amount of Paid-Up Life Insurance shall be in lieu of Extended Insurance.

(B)  CASH SURRENDER VALUE—After this Policy has been in force with premiums paid for five full years upon written request to the Company and the surrender of this Policy and all premium receipt books or other evidence of premium payments the Company will pay the Cash Surrender Value set out in Column "C" in the Table of Non-Forfeiture Values less any indebtedness due the Company hereon. Such written request must be made within thirteen weeks of the due date of the first premium in default.

The basis of reserves for this Policy is the 1941 Standard Industrial Mortality Table (Illinois Standard) with interest at 3½% per year.

For the years subsequent to the 20th the values are to be the equivalent of the full reserves according to the foregoing standard. Proportionate increase will be made in the non-forfeiture values shown in the table for each additional completed quarter year of premium payments.

(15)  ALTERATION AND WAIVERS—This Policy contains the entire agreement between the Company and the Insured. Its terms cannot be changed or its conditions varied, except by a written agreement, signed by the President or Secretary of the Company. No other person shall have the power to make or alter contracts, waive forfeiture, or receive premiums on policies in arrears more than four weeks, or to receipt for the same, and all such arrears given to an agent or employee shall be at the risk of those who pay them and shall not be credited upon the Policy, whether receipted or not, except as set forth in the "Reinstatement" provision herein.

The maximum amount of cash insurance to any policyholder of this Company is limited to Five Hundred Dollars ($500.00) for natural death. The total liability of this Company for all policies of cash insurance in force by it on the life of the person insured by this Policy for natural death shall be the lesser of Five Hundred Dollars ($500.00) or the

**B**



DUPLICATE

BURIAL POLICY

SERVICE *of Alabama*

INSURANCE COMPANY

BIRMINGHAM, ALA.

PREMIUMS PAYABLE FOR
15 YEARS

READ YOUR POLICY

AUTHORIZED UNDERTAKER

F-6-55

## SCHEDULE

DUPLICATE

F-6-55

| NAME OF INSURED | | | | | BENEFICIARY | | | | TYPE POLICY |
|---|---|---|---|---|---|---|---|---|---|
| WILLIAMS  FANNIE | | | | | VOID – SEE ENDORSEMENT  WILLIAMS  CURTIS T. | | F | | F |

| F | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2341927 | 4 | 5 | 65 | 38 | $.28 WK | $300.00 | 36 | 27 | |
| POLICY NUMBER | MO. | DAY | YR. | AGE* | (CENTS) WEEKLY PREMIUM | RETAIL VALUE (ADULTS) | DIST. | DEBIT | |
| | | DATE OF ISSUE | | | | | | | |

*INSURED'S AGE NEXT BIRTHDAY



LIBERTY NATIONAL LIFE INSURANCE COMPANY
BIRMINGHAM, ALABAMA

PAID-UP POLICY CERTIFICATE

NAME OF INSURED

MCCONNELL, FANNIE W.

| TYPE | POLICY NO. | ISSUE DATE | | | AMOUNT | AGE | | | DATE PAID TO | | |
|------|-----------|-----|-----|-----|--------|-----|-----|-----|-----|-----|-----|
| | | MO. | DAY | YR. | | INS. | PREMIUM | AGE | MO. | DAY | YR. |
| F | 2341527 | 4 | 5 | 65 | 36 | 37 | 38 | 2U | 3 | 17 | U0 |

Ms. Fannie McConnell
General Delivery
Collinsville, AL 35961

THIS CERTIFICATE SHOULD BE
ATTACHED TO THE POLICY
IT DESCRIBES

• SEE REVERSE SIDE •

THIS IS TO CERTIFY THAT THE POLICY DESCRIBED
ABOVE IS NOW PAID-UP FOR LIFE AND NO MORE
PREMIUMS WILL BE DUE.

LIBERTY NATIONAL LIFE INSURANCE CO.

SECRETARY

OVERPAYMENT OF PARA ←
NET OVERPAYMENT
FOR WHICH A
CHECK IS ENCLOSED

C